THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* RAYMOND KENNY, Defendant.

County Court, Queens County, March 29, 1938.

*Charles P. Sullivan, District Attorney* [*J. Irwin Shapiro, Assistant District Attorney*, of counsel], for the plaintiff.

*Paul O'Dwyer*, for the defendant.

COLDEN, J. The defendant was heretofore tried for the crime of robbery in the first degree as a second offender and was convicted. The verdict of conviction was set aside and a new trial ordered (167 Misc. 51). In that decision the court said: " I am of the opinion that in the interests of justice there should be a re-examination of all the facts in this case before another jury."

The defendant is again on trial and the People have completed their direct case.

Prior to the defendant being retried he was taken to Fordham University and was there subjected to interrogation by the Rev. Walter G. Summers under a machine described as a pathometer and also a psychogalvanometer.

Fathers Summers is the head of the department of psychology of the Graduate School of Fordham University and holds a degree of doctor of physics from Georgetown University and one in philosophy from the Gregorian University. For seven years he was a professor of physiology at the Medical School of Georgetown University and has done extensive research work and private study in Europe, especially at the University of Vienna.

In his defense the defendant has offered the testimony of Father Summers as to his findings when he examined the defendant under the pathometer.

From a preliminary examination had in the absence of the jury, it appears that the instrument used by Father Summers is an apparatus which was designed for the accurate recording of human emotional reactions. The claim made for its accuracy and reliability is based upon a study which covered more than 6,000 individual tests. This apparatus works upon the electric phenomena developed at the surface of the body during emotional changes. According to the testimony of Father Summers, there are three of these electrical phenomena, two of which are constant and the third a variable. The variable is eliminated entirely during the examination, and one of the two constant phenomena is selected by means of appropriate contact electrodes. By reason of the human emotional reactions which result upon the asking of each question, Father Summers claims to be able to separate and detect both the true and false answers made by the subject. Considerable laboratory work has been done at Fordham University in the detection of deception by means of this apparatus, which has received the popular description of " lie-detector."

In one laboratory test 271 persons were examined. The results of this examination showed that forty-nine of the fifty guilty persons were detected by this procedure. In the accomplice group, of 102 persons 100 were detected. In the innocent group of 119 persons, all were detected.

During the preliminary examination of Father Summers by the district attorney, Father Summers testified that by reason of the realistic circumstances the emotional reactions of those who are accurately accused of crime are more intense and readily ascertainable than in laboratory tests, and he expressed the firm conviction, based upon his extended investigations, that the device, when thus employed, is 100 per cent efficient and accurate in the detection of deception.

Father Summers further testified that in actual examinations of people involved in forty-nine criminal cases, and in many cases of non-criminal and private nature, the results have indicated 100 per

cent accuracy. That is to say, that in all instances where his technique and procedure have been employed his findings have subsequently been confirmed by further investigation or by the results of the trial or by the confession of those who were examined.

The district attorney concedes the scientific value and the practical utility of the apparatus and technique developed by Father Summers, but objects to the admission in evidence of its findings upon the ground, among others, that the scientific principle involved in the use of such pathometer had not yet gone beyond the experimental and reached the demonstrable stage and that it had not yet received general scientific acceptance. He fortifies his contention by argument and by reference to *State* v. *Bohner* (210 Wis. 651; 246 N. W. 314) and *Frye* v. *United States* (293 Fed. 1013). Both of the cases cited by the district attorney refer to the results of systolic blood pressure tests made upon the defendants. In those cases the offers of evidence were refused. This subject is discussed in a note in the Harvard Law Review (Vol. 37, p. 1138), wherein the comment is made: " However, these experimenting psychologists themselves admit that a wholly accurate test is yet to be perfected. Because of this admitted uncertainty the result in the principal case seems sound. (See 2 Wigmore Evidence [2d ed.], § 875.) But, when a deception test finally becomes scientifically accurate, it should be promptly recognized by the courts."

In 2 Wigmore on Evidence ([2d ed.] § 875, p. 237) that learned author says: " If there ever is devised a psychological test for the evaluation of witnesses, the law will run to meet it." It is contended by the defendant that that time has now arrived.

Decision on the question now before the court should be approached with the same breadth of vision which characterizes the decision made by Mr. Justice STEINBRINK in *Beuschal* v. *Manowitz* (151 Misc. 899), wherein that distinguished jurist says: " Law and jurisprudence, which are something more than the dry tomes of the past, can be understood by considering fundamental principles not only of government and economics but also at times by giving consideration in particular cases to sociology, medicine, or other sciences, philosophy and history. New concepts must beat down the crystalized resistance of the legally trained mind that always seeks precedent before the new is accepted into the law. Frequently we must look ahead and not backwards."

It is true that that decision was reversed by the Appellate Division (241 App. Div. 888), and leave to present the question to the Court of Appeals was denied (242 App. Div. 649, and 265 N. Y. 509), but the views therein enunciated by Mr. Justice STEINBRINK were directly instrumental in causing the Legislature at its very next

session to sanction by statute (Laws of 1935, chap. 196) the admission in evidence of blood-grouping tests. (Civ. Prac. Act, § 306-a.)

Objection to the use of scientific proof is not at all novel. At one time or another in their development, testimony as to fingerprints, as to X-rays, as to handwritings, as to bullet markings and as to psychiatric examinations were all refused admission into evidence. (See in this general connection an interesting editorial in the New York Law Journal of April 9, 1937, entitled " Lie Detectors and The Courts.") Their gradual admission into evidence came only after many rebuffs and rejections at the hands of various courts. Today their right to admission in evidence is firmly intrenched in our law. Yet the deductions of handwriting experts and of psychiatrists are not at all uniform and we frequently have such experts testifying in our law courts and drawing conflicting inferences from their examinations. Despite the fact that such experts frequently differ in their conclusions, their testimony is received in evidence, and it is left to a jury to determine which, if either, expert or experts they are going to believe and accept. In this case we are dealing with a science from which varying inferences may not be drawn. According to the testimony of the witness the deductions and the accuracy of the conclusions to be drawn from the examination are undebatable. Both upon legal principle and sound reasoning, it would seem that the courts, if willing to accept and receive handwriting testimony, psychiatric testimony and other such expert opinion, should also admit in evidence testimony of the pathometer test and the results disclosed thereby when a proper foundation has been laid therefor.

For hundreds of years our courts have deemed the examination and cross-examination of witnesses in open court to be the best method so far devised for the ascertainment of the truth and have used that method for lack of any better approach. It seems to me that this pathometer and the technique by which it is used indicate a new and more scientific approach to the ascertainment of truth in legal investigations.

The objection of the district attorney to the admission of the testimony in question is overruled. The testimony will be received and the jury permitted to evaluate it.