THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* VINCENT FORTE, Defendant.

County Court, Kings County, May 28, 1938.

*William F. X. Geoghan, District Attorney [Francis J. Madden, Assistant District Attorney,* of counsel], for the plaintiff.

*Paul J. O'Dwyer,* for the defendant.

FITZGERALD, J. The defendant was indicted for murder in the first degree. He was tried and convicted of that crime. Subsequently the judgment was reversed on a matter of law and a new trial ordered.

On the trial of the indictment no witnesses were called on behalf of the defendant, nor did he testify in his own defense.

In reversing the judgment the Court of Appeals said: " During the trial testimony was introduced by the People of circumstances which no one but the appellant could have explained if any explanation existed."

Again: " Testimony in the case in regard to certain facts and circumstances indicated that defendant was guilty of the crime charged." (*People* v. *Forte,* 277 N. Y. 440, 441, 442.)

A motion is now made that the defendant be subjected to examination under a pathometer or so-called " lie detector." Although it does not appear from the moving papers, it was stated in open court that the application was to order the defendant to Bronx county for the desired test.

This motion is based upon an affidavit by defendant's counsel. No affidavit by defendant has been submitted. At no time has

defendant ever declared under oath his innocence of the crime charged.

The decisions and writings of text writers upon the use of "lie-detectors" have all practically been concerned with the admissibility of testimony as to the result of such tests. There is a dearth of authority as to the circumstances which should be permitted or directed.

The *Kenny* case (*People* v. *Kenny*, 167 Misc. 51) is the only reported criminal case in which a "lie detector" was used. It is said that such a device was used in an unreported case in 1924 in Indianapolis, and since then in unreported cases in California and Washington. (Richardson on Evidence [5th ed.], § 534, p. 451.)

In the *Kenny* case a trial had been held at which the defendant had testified; the jury returned a verdict of guilty; the verdict was set aside with a statement by the court in which it said: "I am of the opinion that in the interests of justice there should be a re-examination of all the facts in this case before another jury."

Subsequently the defendant was subjected to a test by a pathometer. On the second trial the question raised and determined was whether testimony as to the results of the test should be received.

Professor Wigmore, in his "Code of Evidence" ([2d ed.] § 967, p. 198), sets forth the minimum requirements which, in his opinion, should be insisted upon before testimony of the result of such tests should be admitted.

It must be borne in mind that the use of "lie detectors" is not to establish any independent fact in issue; its primary, indeed, its sole purpose is to demonstrate that the defendant is worthy of belief. It is a device which tends to sustain or to discredit the defendant's credibility.

It would be a rash prophet who would dogmatically assert that as a result of scientific research a device that would be of inestimable value in accurately and unerringly ascertaining the truthfulness of testimony is impossible of perfection. The extraordinary strides made in so many fields of human endeavor as a result of scientific study would stamp as foolhardy any such contention. Whether such a device now actually exists is beyond the question.

"If there ever is devised a psychological test for the *valuation of witnesses*, the law will run to meet it." (2 Wigmore on Evidence [2d ed.], § 875, p. 237.)

There is neither unanimity, nor even approximate agreement among writers upon the question whether such a device has been perfected.

The court expresses no opinion on that subject.

To justify the use of any such test " There must first be proof of general scientific recognition that they are valid and feasible." (2 Wigmore on Evidence [2d ed.], § 875, p. 237.)

*Frye* v. *United States* (54 App. D. C. 46; 34 A. L. R. 145 [1923]) is the first reported case passed upon by an appellate court in which the question of the admissibility of the results of a systolic blood pressure test was reviewed. It was there held that such a test had not then gained such standing and scientific recognition among physiological and psychological authorities as to justify the admission of expert testimony deduced from tests made under such a theory.

In *State* v. *Bohner* (210 Wis. 651; 246 N. W. 314), decided in 1933, the court, referring to *Frye* v. *United States* (*supra*), said: " We are not satisfied that this instrument, during the ten years that have elapsed since the decision in the *Frye* case, has progressed from the experimental to the demonstrable stage."

The court quoted with approval the following excerpt from Wigmore's " Principles of Judicial Proof " ([2d ed.] § 249, p. 634): " Looking back at the range of possibilities for experimental psychometric methods of ascertaining concrete data for valuing testimonial evidence, it will be seen that thus far the only new psychometric method that has demonstrated any utility is the blood-pressure method, which detects lies; * * * the record of psychometric achievement with testimony is still meagre. * * * The conditions required for truly scientific observation and experiment are seldom practical. The testimonial mental processes are so complex and variable that millions of instances must be studied before safe generalizations can be made."

In connection with Professor Wigmore's deduction, the following quotation from an article in 33 Yale Law Journal, 771, on " The Use of Psychological Tests to Determine the Credibility of Witnesses," should be borne in mind: " The conditions in a laboratory are so dissimilar to those of a court room as to justify questioning the use of even a proved laboratory method."

No other cases have been found in which the use of a " lie detector " has been passed upon.

In a note in 86 American Law Reports (p. 616) it is stated that no criminal case other than the *Frye* and *Bohner* cases (*supra*) had been found in which introduction of a physiological deception test of any kind had been sought by either the defense or the prosecution, and that no civil case had been found in which an attempt had been made to use any deception test for the purpose of establishing or questioning the credibility of a party or a witness.

In an article in the New York Law Journal, April 12, 1938, on the " Lie Detector in Court," the writer states that a hurried search has confirmed the foregoing statement as to civil cases. Other than as reviewed herein a careful search by the court has failed to disclose any case, criminal or civil.

Attention is called in the foregoing note to an article by Doctor Poffenberger of Columbia University, psychology department, in 24 Columbia Law Review, 429, to the effect that the blood pressure test had not as yet advanced out of the experimental stage, and that it had not yet been satisfactorily established that different emotions produce such definite and distinct changes in blood pressure that they can be successfully separated and measured by mechanical processes.

In *People* v. *Kenny* (*supra*) it appears that the claim for the accuracy and reliability of the apparatus used therein is based upon a study of more than 6,000 individual tests.

" This apparatus," said the court, " works upon the electric phenomena developed at the surface of the body during emotional changes. According to the testimony of Father Summers there are three of these electrical phenomena, two of which are constant and the third a variable. The variable is eliminated entirely during the examination, and one of the two constant phenomena is selected by means of appropriate contact electrodes. By reason of the human emotional reactions which result upon the asking of each question, Father Summers claims to be able to separate and detect both the true and the false answers made by the subject. Considerable laboratory work has been done at Fordham University in the detection of deception by means of this apparatus, which has received the popular description of ' Lie Detector.' "

The court is advised that the desired test herein is to be made by the same operator with the same apparatus.

The statement in the *Kenny* case does not convince this court that facts can be established to justify the proposed test. In view of the study and observations of writers who have studied the question intensively, it can hardly be asserted that it is capable of demonstration " that there is general scientific recognition " that the proposed test is valid and feasible.

Professor Wigmore, in " The Science of Judicial Proof " ([3d ed.] § 310, p. 761 [1937]), discusses the possibility of detecting testimonial error by methods of experimental psychometry. He states psychometrical data obtained by experts might assist the valuation of testimonial evidence at one of three stages, which for convenience he designated as the primary, secondary and tertiary degrees (§ 310). After an exhaustive discussion and analyses of methods

and results, his conclusions are that in contrast to the traditional methods of the forum there are not " yet actually available, in acceptance by the psychological profession, psychometric methods which will yield any of the foregoing desirable and conceivable results " (§ 311, p. 764).

Even if such tests were generally accepted by scientific men as valid and feasible, innumerable details of procedure would remain to be determined.

In the instant case the defendant, while tried, did not testify, nor has he even stated under oath his innocence. If a test were authorized and proved unfavorable to defendant, would testimony of the test be admissible over defendant's objection and refusal to testify? Some writers express the opinion that use against the defendant of the result of such tests would not violate the inhibition against self-incrimination. (37 Harvard Law Rev. 1138; N. Y. L. J. Oct. 5, 1935, p. 1134.)

It seems to the court that if such tests were authorized definite rules should be authoritatively established for their conduct. Who would determine the questions to be asked of defendants? If there should be disagreement between the district attorney and counsel for defendant as to any question, how, when and where should the controversy be determined? Innumerable other difficulties may easily be pictured, all of which, in my opinion, should be regulated before such an innovation is introduced in the law.

The application is to have the defendant taken from the custody of the commissioner of corrections and committed to the custody of some individual police officer and conducted to Fordham University in Bronx county for the test.

The custody of persons charged with crime is fixed by law.

Under certain circumstances persons in custody may be temporarily transferred to other custody.

Courts have no inherent powers to control the custody of persons held to answer charges or convicted of crime. The court knows of no statute which empowers it to take the defendant from the custody of the commissioner of correction and to commit him to the custody of a county detective attached to the office of the district attorney of Kings county and to authorize such detective to remove the defendant from this county for any purpose.

For the foregoing reasons the motion is denied.

As defendant was to be put on trial immediately after the decision of this motion this memorandum was withheld until the conclusion of the trial.

Defendant has since been retried and again convicted of murder in the first degree. At the conclusion of the summation a motion

was made to reopen the case and that defendant be taken to the Fordham University to be examined under the pathometer, or lie detector, by the Rev. Walter G. Summers. In support of the application it was stated that if the application was granted it was intended to show, counsel said, " that he has contributed to various American scientific magazines, that he has been a member for a long period of time of the most outstanding American scientific societies; that since 1931 he has devoted his time exclusively to the development of the pathometer or the psychogalvometer, as it is sometimes called, more commonly known as the lie detector. I will show that he has used his experiment at the request of the Police Department of the City of New York on numerous occasions; that he has been in constant touch with the District Attorney's office of Westchester County and with the District Attorney's office of Queens County and has conducted various tests for them from time to time; and I will further show the Court, if I am allowed to introduce this testimony, that in every case in which he has appeared and conducted an experiment either for the Police Department of the City of New York or for the District Attorney's office of Queens County or for the District Attorney's office of Westchester County, that the subsequent result of the case verified his original finding.

" I will further show the Court, if I am allowed to introduce this testimony, that he has conducted during his experience six thousand various tests, all of which proved the conclusion that he came to and the conclusions which he testified to in the case of the *People* v. *Kenny* (*supra*), that his device was a proper way of testing the truth or the falsity of the man's statements.

" As a matter of fact, I will show that the conclusion reached in that case was complete, and his conclusion was based upon his six thousand cases and upon his research, and his work in the various universities, and in connection with his work with prosecuting offices. His conclusion was that the machine used for the tests was infallible.

" I intend to show further that in his various tests he has been brought into the various cases not knowing what had happened before he was brought in; that he was able to determine exactly what the facts were without having had any prior knowledge, thereby verifying everything that had happened before.

" I intend to show further, if I am allowed to use this evidence, that in the case of the People of the State of New York against Major Green, a murder case in the County of Queens, the defendant in that case was taken to the laboratory of Father Summers at Fordham University before he was booked and charged with the murder. Up to that time I intend to show that the District

Attorney's office did not have any concrete evidence on which to charge Major Green with the murder, for which he was subsequently convicted. After being placed nnder the lie detector test by Father Summers, Father Summers advised the District Attorney's office that he was the man who had committed the particular murder.

" I will show the Court that at that time Major Green did confess to the murder, and he did involve another negro with him and that the other negro was brought forward, and Father Summers at that time, after examining the other negro, advised the District Attorney's office and the police that the other negro had nothing to do with it but that the other negro had had something on his mind, and subsequent investigation showed that, as a matter of fact, the other man was stealing from his boss, and he was subsequently convicted of that crime. * * *

" I feel, under all the circumstances, now, that after the defendant has taken the stand and has denied that he participated in this crime or had anything to do with it, I believe now that the Court should permit me to reopen the case and adjourn it for a sufficient time until I take this defendant up to Fordham University in the Bronx, or that the District Attorney name somebody whom he says is competent to administer the lie detector; or that the Court appoint somebody who, in the Court's judgment, is competent to administer the lie detector, and have those tests so that we may know the truth."

Waiving the question of the power of the court to direct the defendant to be taken from the county to be examined as requested, and waiving further the propriety of reopening the case after the completion by both sides of the summation, the court is of the opinion that if the facts stated were established the evidence would still be insufficient to establish that the apparatus proposed, or any other in use, has such general scientific recognition as valid and feasible metbods as to justify the procedure proposed. (Wigmore's " The Science of Judicial Proof " [3d ed.], supra.)

As the judgment herein must be passed upon by the Court of Appeals, the court directs that this memorandum be attached to and incorporated in the minutes of the case, so that it may form part of the record on appeal.