Michael Potter, M.
The defendant is charged with operating a motor vehicle along a portion of Drumgoole Boulevard on Staten Island, at an excessive rate of speed, namely, at 48 miles per hour in a traffic zone having a posted rate of speed of 40 miles per hour, in violation of section 60 of the Traffic Regulations of the City of New York. Speeding at the scene of the alleged infraction was checked by radar, and highway signs to that effect warned the motorist.
The defendant denies the charge, and impugns the worth of radar as a speed-checking agency. The People maintain that it is a reliable and accepted yardstick to measure the velocity of a moving vehicle. The defendant urges the contrary, and contends that to receive it as a true and proven instrument for determining speed would, in effect, raise its recordings to the position of demonstrative and conclusive proof, thereby foreclosing any possible defense to the speeding charge. The defendant is encouraged in his stand by the testimony of the People’s expert witness on radar, namely, Dr. John M. Kopper of Johns Hopkins University. As the People’s proponent on the efficacy of radar in speed checking, Dr. Kopper claimed the method to be accurate, but subject to an engineering tolerance of two miles per hour, plus or minus.[1] Thus, the People concede that the use of the radar device carries with it a possible deviation.
The defendant seizes upon this possible imprecision and argues that by reason thereof, the People cannot sustain, beyond a reasonable doubt, the specific charge that he exceeded the legal rate of speed by eight miles per hour. If such precise and inflexible proof were essential to convict, then in view of the said possible variation, the court would need to go no further, and it would, instanter, grant the defendant’s motions to dismiss. However, that is not the case.
*420 Palpably, the defendant’s contention is that even proof of a lesser prohibited rate of speed is proof of a different offense alien to the one charged in the complaint, thereby resulting in a fatal variance between allegation and proof. That argument lacks vigor. The gravamen of a speeding offense is always the operation of a motor vehicle at any rate of speed beyond that legally permitted at the given time and place.
Any competent and credible evidence of speed above the legal rate thereof would suffice to support a conviction. Thus, speed of 44 or 46 miles per hour or any speed exceeding the posted rate of 40 miles per hour, after allowing for the admitted engineering tolerance, would establish a case against the defendant.
Even were we to regard proof of such a lesser proscribed rate of speed as establishing a separate and distinct offense, nevertheless, it would properly fall within that class of infractions of the law known as “ included offenses”. Hence, the violation charged in the case at bar might well be treated in the same manner as an offense which admits of degrees, the greater charge including the lesser (23 C. J. S., Criminal Law, § 1288, pp. 863-864; People v. Savarese, 1 Misc 2d 305; State v. Dantonio, 18 N. J. 570, 581; People v. Gossman, 95 Cal. App. 2d, 293, 295; Federal Rules of Crim. Pro. for the United States District Courts, rule 31, subd. [c]).
Nor does the fact that Dr. Kopper qualified his estimate of the possible tolerance with the words “ plus or minus ”, reasonably increase the doubt herein so as to warrant a dismissal of the complaint. The phrase “ plus or minus ” or its equivalent “ more or less ” is merely an expression of safety and precaution to indicate slight or inconsequential deviation from standard measurement (Capitol Wine & Spirit Corp. v. Berkshire, 150 F. 2d 619, 621).
We now come to the cardinal issue in the case, i.e,, in the face of the possible engineering tolerance, was the radar device used in the instant case, a sufficiently competent and accurate method of measuring the defendant’s alleged excessive rate of speed? The question, therefore, becomes one of the admission or exclusion of evidence.
The court takes judicial notice that the word “ radar ” is a convenient contraction of the phrase ‘ ‘ radio detection and ranging ”. The essential procedure for setting up and testing radar equipment and its employment for measuring traffic speed have been considered by courts and textwriters. (People v. Katz, 205 Misc. 522; People v. Sarver, 205 Misc. 523; People v. Sachs, 1 Misc 2d 148; State v. Dantonio, supra; State v. *421 Moffitt, 100 A. 2d 778, 779 [Del.]; Woodbridge, Radar in the Courts, 40 Va. Law Rev. 809, 814; Baer, Radar Goes To Court, 33 N. C. Law Rev. 355; as to the nature and use of speedmeters, vide Kopper’s article, mentioned supra, footnote [1].)
The radar equipment and police procedure in the case at bar were substantially the same as those considered in the cases and articles cited.
The People showed: The police unit consisting of three officers used a standard radar speedmeter comprised of three separate sections, namely, a transmitter-receiver transmitting and receiving micro waves, a clock or indicator registering the rate of speed, and a graphic recorder simultaneously making a written record of the speed indicated, all of these sections being interconnected by electric cables and powered by a six-volt battery. In addition to the radar instrument, the officers were provided with two patrol cars, one to carry the radar equipment and the other to intercept the speeding vehicle; the cars being in communication with each other by means of a radio-telephone. Finally, for the purpose of testing the speed-checking accuracy of the radar device before and after the day’s operation, the police equipment included a calibrated speedometer affixed to a police motorcycle.
The officers operating the radar and intercepting cars had each received more than perfunctory training and instruction in the use of the radar apparatus.
The intercepting or apprehending car was stationed 1,000 feet in front of the radar car, and so placed that it could proceed in the same direction as traffic under observation. The cars were in sight of each other. The day was clear and dry; the time the early afternoon.
The accuracy of the radar speedmeter was initially tested by running the police motorcycle through the zone to be serviced by the radar device. The readings on the radar speedmeter and the motorcycle’s speedometer corresponded. The police unit then began its watch. Shortly thereafter, the defendant drove his station wagon through the so-called zone ol' influence, i.e., the range or area of the highway to which the radar apparatus had been made sensitive for speed-checking. No other car was abreast of or immediately behind the defendant’s vehicle. The speed indicator and graphic recorder both registered the vehicle’s rate of speed at 48 miles per hour in the 40 mile per hour zone. The graphic recorder was stopped at the time of the observation. The observer in the radar car inscribed on the recorder the time of the alleged infraction, a *422 description of the vehicle and other germane information to substantiate the charge. Upon the People’s offer, the chart of the recorder was received in evidence.
The officer in the radar car first noticed the defendant’s station wagon when it was about 1,000 feet to the rear of the police vehicle. Such observation was made by means of the rear-view mirror on the radar car. The needle of the speed indicator moved when the defendant’s vehicle reached a point of about 160 feet from the rear of the radar car. The officer therein communicated by radio-telephone, the details of the alleged violation to the apprehending officer ahead, and at the same time watched the defendant’s vehicle until its interception. The officers made certain of the identity of the vehicle intercepted.
Upon completion of the day’s mission, a second and closing test of the accuracy of the radar speedmeter was made by the police unit by comparing it once again with the calibrated speedometer on the motorcycle then run through the field of radar operation. Speedmeter and speedometer once more agreed. Though made by persons not technically skilled in the science of electronics, such accuracy tests were, nevertheless, admissible in evidence (State v. Moffitt, supra, p. 779; State v. Dantonio, 31 N. J. Super. 105, 110, 112, affd. 18 N. J. 570, 573-574).
In support of his prime defense that the radar device used was inaccurate, the defendant maintained that he had been traveling under 40 miles per hour. He also endeavored to show that the speedometer on his vehicle had been properly tested by introducing, in evidence, two bills bearing notations to said effect. He had not seen his speedometer checked. Nor had he called as witnesses those who tested it.
The scientific theory and process of checking speed by radar was explained by Dr. Hopper on behalf of the People. In substance, his explanation came to this: The transmitter-component of the instrument casts a beam in the path of the oncoming vehicle. The beam consists of microwaves at the frequency of 2455 megacycles per second. The vehicle becomes the beam’s target. The beam strikes or illuminates the target, and in turn is reflected or echoed back to the receiver-part of the mechanism. The frequency of the waves so returning is different from the frequency of the waves originally transmitted. The closer the target approaches the radar device within the zone of influence, the higher this difference between the two frequencies. Upon reaching the receiver, the returning waves miT with a portion of the energy radiated from the trans *423 mitter. This mixture creates a phenomenon called “beats”.[2] This phenomenon is analogous to that of “ beats ” in music, where, upon simultaneously striking two adjacent keys on a piano, the combined tones develop greater definition and intensity, resulting in an alternate rising and falling or throbbing of sound identified as such “ beats ”.
It is to be inferred from Dr. Kopper’s explanation that just as “ beats ” occur with combined sound waves of different frequencies, so can they also occur with intermingled radio or light waves of different frequencies. According to the witness, the number of such radio ‘1 beats ’ ’ per second is equal to the difference between the frequency of the waves transmitted and that of the waves received; the said number of “ beats ” being directly proportional to the velocity of the target. Accordingly, the radar device has as its primary function, the measurement of the mentioned difference of the said frequencies, or the computation of the number of “beats” per second. Ultimately, the measurement is made in the form of an electrical quantity in terms of electrical current; the current being directly related to the number of “beats”. A scale can be made for such measurement and affixed to the radar apparatus, so as to translate the number of “ beats ” per second into miles per hour. In fine, the radar speedmeter is a “beat” or “ pulse ” frequency meter with its readings given in miles per hour instead of in “ beats ” per second.[3]
After hearing the expert testimony of Dr. Kopper as to the nature and function of the radar device and the proof of its practical application offered by the police unit, I am convinced that it may be accepted as an instrument of scientific integrity and reasonable accuracy. My conclusion rests solely upon such testimony and proof. However, the People go one step further and urge upon the court with a great deal of cogency, that the time has arrived when, in any event, judicial notice should *424 be taken of the effectiveness of the instrument after proof of reasonable testing. The People point to the general scientific use of radar instruments for measuring time and space; the basic principles for the creation and operation of such instruments being the same as those employed in the development of the radar speedmeter. Hence, the People would dispense with the requirement of producing in case after case, expert testimony as to the nature and function of the said speedmeter. Such testimony, they claim, is invariably accepted as establishing that the radar device is the direct product of electronic principles practically applied; and so, frequent reiteration of such truth no longer serves any useful purpose and, in essence, has descended to a mere ritual of proof.
The ordinary rule is that the practical application of scientific principles or discoveries are not juridically recognized as valid while still at the experimental stage. Such application must advance to the point of demonstration and, thus, be generally acknowledged as true in its own special, scientific sphere or field and then be publicly accepted in order to merit judicial notice (Richardson on Evidence [8th ed.], § 40, pp. 22, 23; Matter of Madura v. City of New York, 238 N. Y. 214, 216; People v. Gitlow, 234 N. Y. 132, 143; People v. Snyder, 41 N. Y. 397, 398; 9 Wigmore on Evidence [3d ed.], § 2583 on the need for wider use, by the courts, of the doctrine of judicial notice).
Has the radar speedmeter reached the stage where judicial notice may be taken of its accuracy as a speed measuring device! Is it now generally recognized as a practical application of scientific principles! Courts ordinarily pause before accepting the novel. Such hesitation has just ground. Too many innovations hastily proclaimed as scientific ultimately sink into disrepute. Hence, precipitate, judicial recognition might well lead the trier of the facts to accord them an unmerited worth to the defendant’s peril and prejudice (37 Harv. L. Rev. 1138-1139). Accordingly, inventions wanting reasonable certainty are rejected as instruments of proof. Thus, evidence based on pathometer, polygraph or " lie detector ” tests is generally excluded for that reason (People v. Forte, 167 Misc. 868, affd. 279 N. Y. 204; People v. Becker, 300 Mich. 562).
Despite the stringency of the rule, it seems to me that it is timely to take judicial notice of the dependable character and operation of radar in detecting and recording the speed of motor vehicles, and thereby to relieve the People of the burden of adducing expert testimony. For this view, the court finds *425 firm support in the textwriters (Prof. Woodbridge, 40 Va. Law Rev. 814; Prof. Baer, 33 N. C. Law Rev. 381).
To take judicial notice of the reasonable accuracy of the ordinary speedometer after proper testing (People v. Tyler, 109 N. Y. S. 2d 756; Shulman v. Roseth Corp., 227 App. Div. 577),[4] and in the same breath, to deny such recognition to an adequately tested radar speedmeter unless expert testimony is first given as to its nature and function is to make a fetish of expert testimony. If we are to suspect the efficacy of the radar speedmeter unless repeatedly supported by expert testimony, then by the same token should we not also distrust proof founded upon the operation of other radar instruments now universally accepted, without such expert testimony, such as devices for guiding aircraft (Radar Landing Systems, 63 Aero Digest 34 [1951]), since the same basic principles govern all radar devices?
Many scientific processes have become subjects of judicial notice, thereby obviating the need for preliminary expert testimony on their nature and function. Such recognition has been given to the chemical analysis of body fluids when considered together with external symptoms to prove intoxication (119 Journal Amer. Med. Assn. 653, 654 [1942]; Kirschwing v. Farrer, 114 Colo. 421 [blood test]; State v. Duguid, 50 Ariz. 276 [urine test]). Vide annotations (127 A. L. R. 1513; 159 A. L. R. 209) on admissibility and weight of evidence based on scientific test for intoxication or presence of alcohol in system. However, in New York, the subject is now covered by statute, namely, subdivision 5 of section 70 of the Vehicle and Traffic Law.
A like recognition is granted to fingerprinting (People v. Roach, 215 N. Y. 592; Moon v. State, 22 Ariz. 418; State v. Conners, 87 N. J. L. 419; State v. Huffman, 209 N. C. 10; Stacy v. State, 49 Okla. Crim. Rep. 154). And also to ballistics (People v. Soper, 243 N. Y. 320; State v. Outerbridge, 82 N. C. 535; Inbau, Firearms Identification — Ballistics, 24 Jour. Crim. Law 825 [1934]).
It is not the office of the courts in their quest for truth, to assess, by trial and error, the scientific worth of the new and the novel. That task properly falls to those men of science who are specially trained and versed in the particular scientific fields to which the innovations belong. But when after scientific testing a new evidential tool is made ready for use, the courts should be willing to accept it and take judicial notice of its *426 nature and function. If a cathode ray oscillograph can regulate a watch, determine the speed of a bullet, gauge a musical tone and time shutter speeds, and no court can question the truth thereof, then the courts must also accept as true what trusted and skilled men of science in cognate and related fields have found to be true, namely, that a reasonably tested radar speed-meter such as the one used in the case at bar, constitutes a reliable device for measuring speed within the range of the engineering tolerance mentioned. Essentially, the Supreme Court of New Jersey has now arrived at this conclusion (State v. Dantonio, 18 N. J. 570, 578-579).
The higher appellate courts of New York have not as yet had squarely before them, the question of taking judicial notice of the effectiveness of tested speedmeters. True, there is a decision in the lower New York courts that such judicial notice is not as yet timely (City of Buffalo v. Beck, 205 Misc. 757). With due deference to that court’s view, I can assign no good reason for not accepting now what must be accepted later (Commissioner of Welfare v. Costonie, 277 App. Div. 90, 92, 97).
The question still remains to be answered as to whether taking-such judicial notice would not, in effect, raise the radar recordings to such final and conclusive proof of guilt as to foreclose all chance of exculpation. True, to a marked degree the trial would become a contest between man and machine. Nevertheless, in view of the conceded engineering tolerance approximating two miles per hour, what weight should be accorded the machine’s recordings in the face of the entire proof in each case, would still be a substantial question for the trier of the facts (2 Wharton on Criminal Evidence [12th ed.], § 670, pp. 599-600).
It appears to me that in the instant case, the People’s admission of the possibility of some variation is not to facilitate conviction or perpetuate error, but on the contrary, to reach accuracy as proximately as possible. Plainly then, though such frank admission runs against the People in arriving at the true speed at which the defendant’s vehicle was traveling, such possibility of error would not be ground to exclude the evidence (State v. Dantonio, 18 N. J. 570, 578, 580; Ross v. Marx, 24 N. J. Super 25). I presume that no one would gainsay the fact that no instrument designed and fashioned by man could be so precise as to be an infallible measure of time and space, and so defeat all variation. Hence, reasonable and relative accuracy is all that we may dare to expect.
I conclude that the registering and recording of the speed of the defendant’s vehicle by the radar speedmeter in the case *427 at bar, in view of Dr. Kopper’s explanation of its nature and function, and the way in which it was set up, tested and operated by the police unit, constituted legally admissible evidence.
I feel that the People have proved both a prima facie case and a case beyond a reasonable doubt. Accordingly defendant’s motions to dismiss the complaint are denied and the defendant found guilty as charged.
In view of the evident sincerity and earnestness of defendant and his counsel in contesting the charge herein, sentence is suspended.

. In his article entitled The Scientific Reliability of Radar Speedmeters (33 N. C. Law Rev. 344, 350) Dr. Kopper explains how “ tolerance ” is ascertained. He says: “ In discussing the accuracy of any method of measurement we attempt to state the tolerances involved in the final result. * * * Hence, in assessing the accuracy of a method of measurement we evaluate the tolerance in the individual parts of the method, add them all together to see what the maximum possible tolerance is, and then claim that the method can be used to make the measurement to within the tolerance found.”

. TMs phenomenon of “ beats ” is named “ the Doppler effect ” after the Austrian physicist, Christian Johann Doppler who, in 1842, called attention to the change of frequency that occurs when a moving object reflects back microwaves emanating from a source of constant frequency. The Doppler effect has been employed for about a century to measure the speed of stars and for more than a decade to determine the velocity of airplanes. Thus, the said effect is now being applied to ascertain the speed of objects traveling upon the ground. (Hall, Radar Aids to Navigation 105-110, McGraw-Hill Book Co., [1946] ; MIT Radiation Laboratory Series, No. 2.)

. Vide for clear explanation of different types of radar systems: Ridenour, Radar Systems, Engineering, C.5 (McGraw-Hill Book Co., 1947); M I T — Radiation Lab. Series, No. 1 and No. 2; Hall, Radar Aids to Navigation, footnote (2).

. In England, courts have accepted speedometer readings even without proof of accuracy tests. (Nicholas v. Penny [1950], 2 K. B. 466.)