STATE of Missouri, Plaintiff-Respondent,

v.

George A. GRAHAM, Defendant-Appellant.

No. 7739.

Springfield Court of Appeals.

Missouri.

Feb. 13, 1959.

Motion for Rehearing, or to Transfer to Supreme Court, Overruled

March 9, 1959.

———◆———

Claude T. Wood, Richland, Ronald J. Fuller, Rolla, for defendant-appellant.

Jay V. White, Rolla, for plaintiff-respondent.

RUARK, Judge.

Defendant was convicted of driving an auto transport (loaded with four Chevrolets) upon the highway at a speed in excess of 50 miles per hour.

The information charged that defendant did "wilfully and unlawfully operate a motor vehicle as a motor carrier under certificate or permit number T4430X, assigned *to him* by the Missouri Public Service Commission, upon a public highway of this State, to-wit, U. S. Highway 66, at a rate of speed in excess of 50 miles per hour, to-wit, 65 miles per hour, contrary to the form of the Public Service Commission Rule No. 44 and the Statutes in such cases made and provided * * *."

The evidence clearly showed that certificate number T4430X was issued to "Complete Auto Transit," which was licensed as a *contract carrier.* Defendant held no certificate but was an employee-driver of "Complete Auto Transit."

One of defendant's assignments is that the prohibition of speed in excess of 50 miles per hour is applicable only to common carriers and not to contract carriers.

The contention is based upon Rule 1(c) of the commission, which provides that the term "motor carrier" as defined in all outstanding certificates of convenience and necessity issued "prior to the effective date of this General Order shall henceforth be deemed to mean 'common carrier' as defined in Chapter 390, 1951 Supplement to RSMo 1949 [V.A.M.S.]." Subsection (d) of the same section provides that the term "contract hauler" as used in all outstanding permits shall be deemed to mean "contract carrier" as defined in said 1951 Supplement.

By Section 390.020 RSMo 1949, V.A.M.S. (Laws of 1951, p. 549), (5) the term "common carrier" is defined as a person holding himself out to the general public to engage in general transportation of passengers or property; (6) the term "contract carrier" means any person who engages in transportation under individual contracts; but (8) the term *"motor carrier"* includes both common carriers and contract carriers "as herein defined."

By Section 390.131, V.A.M.S. (Section 390.160, Laws of 1951, p. 557), the legislature authorized the Public Service Commission to promulgate safety rules which, in addition to any others deemed necessary by the commission, shall include (5) no motor carrier shall operate a vehicle, under his certificate or permit, upon the highways of the State of Missouri at a rate of speed in excess of 50 miles per hour. By Rule 44 the commission provided that no motor carrier shall operate a vehicle under his certificate upon the highways at a rate of speed in excess of 50 miles per hour.

The rule was promulgated under the mandate of the statute. This mandate required, "shall include," a limitation upon the speed of motor carriers. The statutes plainly defined motor carriers as including both common carriers and contract carriers. Any attempt by the Public Service Commission to limit or eliminate this plain definition would have been invalid.[1]

---

1. State ex rel. Springfield Warehouse & Transfer Co. v. Public Service Commission, 240 Mo.App. 1147, 225 S.W.2d 792.

But the definition of a contract carrier as given in the commission's 1(d) does not by its terms *exclude* it from the general classification of "motor carrier" as defined by the statute. It makes the terms "contract hauler" and "contract carrier," as applied to outstanding certificates, synonymous. Nor does 1(c) exclude contract carriers. It deems a motor carrier as a common carrier, "as defined in Chapter 390 * * *." The definitions in the Public Service Commission rules were obviously made in order to stabilize previously issued authorities.

Other assignments of appellant can be grouped under the contention that the defendant, not being a motor carrier himself but only an employee of the carrier, could not be convicted of the misdemeanor; that the prohibition extends only to the certificate holder and authorizes a prosecution against (only) the carrier itself; but, and in addition, if the statute does permit the prosecution of the employee, nevertheless he has been charged under one statute and convicted under another.

■ As to the first contention, i. e., that the prohibition extends only to the certificate holder, the answer is that Section 390.171, V.A.M.S. (Section 390.175, Laws of 1951, p. 559) provides that every owner, officer, agent or employee of any motor carrier, or every other person, who violates or fails to comply with any order, decision, rule, direction, demand or regulation thereof, or who procures, aids or abets in such violation, shall be guilty of a misdemeanor. Under the evidence the defendant was a person specifically designated and prohibited from procuring, aiding or abetting in the violation, to-wit, driving the motor transport in excess of 50 miles per hour.

The second contention, which amounts to the assertion that defendant was charged with one thing and convicted of another, is based on the theory that the charge laid in the information was necessarily made under Section 390.176, V.A.M.S. (Laws of 1951, p. 560), entitled "Penalties—what deemed separate offense—how construed," which provides that "any person operating as a motor carrier" who violates or fails to comply with any provision of the constitution or any law, or who fails or omits to comply with any order, decision, rule or requirement of the commission, is subject to a penalty of not less than $100 nor more than $1,000 for each offense. Paragraph 3 of such section makes the act of the employee the act of the motor carrier.[2]

■ Even if we assume that Section 390.176 creates a crime instead of a civil penalty liability, nevertheless the things prohibited by such section are also included in and encompassed by Section 390.171, which applies to every person and is not limited to the certificate holder only. If the act of the defendant made his employer liable under Section 390.176, then he became a person who "procures, aids or abets" in the violation under Section 390.171. Agents, accessories, aiders, and abetters are liable as principals and may be charged as such.[3]

" 'It is a general rule of criminal procedure that if one is indicted under one section of a statute, and the evidence shows that he is not guilty of a violation of that section, but is guilty of the violation of another section, he may be convicted of a violation under the section of which the evidence shows him guilty, provided the indictment is broad enough to include the offense within its allegation.' State v. Quinn,

2. Section 390.156 (formerly Section 390.177) provides that an action to recover penalties may be commenced and prosecuted by the general counsel of the commission. Section 390.161 (formerly Section 390.178) provides that penalties shall be cumulative.

3. 22 C.J.S. Criminal Law § 81b, p. 146; State v. Sargent, 241 Mo.App. 1085, 256 S.W.2d 265, 272; State v. Weston, Mo. App., 275 S.W.2d 601.

94 Mo.App. 59, 67 S.W. 974." State v. Hamill, 127 Mo.App. 661, 106 S.W. 1103.

" 'To test the question whether an indictment for one offense includes another, it has been said that where the offenses are of the same general character, the indictment for the one offense must contain all the essential elements of the other, otherwise the prosecution for the latter cannot be maintained.' " State v. Moon, 221 Mo. App. 592, 283 S.W. 468, 470.

 The fact that the information contained the statement that the certificate was issued *"to him"* was unnecessary to complete the charge under Section 390.171. It was not an "essential ingredient" of the act which made the crime.[4] Words which add nothing to the statement of the charge are simply surplusage and are to be disregarded so long as they do not mislead the defendant,[5] especially after a verdict responsive to the charge when not properly attacked before verdict.[6] The gravamen of the offense is that the person charged drove, or procured, aided, and abetted in the driving of, a vehicle of the character involved upon the highway at a speed in excess of 50 miles per hour. It made no difference *who* held the certificate, and the allegation that it was issued "to him" is simply surplusage.

Error is assigned "in the admission in evidence over the objection of the appellant of state's Exhibit No. 1, Rule 33–C of the Public Service Commission, for the reason that said rule was not pleaded in the information."

 State's Exhibit 1 does not appear in the transcript, nor is it produced in accordance with stipulation. An appellate court cannot ordinarily pass upon the competency of documentary evidence which is neither set forth in the transcript nor produced.[7]

The offer was " * * * the rules and regulations of the Public Service Commission relating to contract carriers and truck haulers," "the entire pamphlet," "I offer into evidence this pamphlet marked S–I, and more particularly on page 74, what's marked 'Rule 44, Speed Limits, subparagraph (a), Rates of Speed.' " We can surmise from the language that "Rule 44" was contained in the exhibit offered. The information charged that defendant operated a motor vehicle as a motor carrier, under Public Service Commission certificate, in excess of 50 miles per hour, contrary to the form of Public Service Commission Rule 44.

 The objection here made could not in any event be sustained, because it first appears on appeal. The *only* objections made to the offer of such evidence in the trial court were that (a) it was not the best evidence and (b) the exhibit was not certified. But these objections have now been abandoned. The objection here made was not made at the trial. A litigant will not be permitted to ambush the trial court by making one objection at trial and then, on appeal, asserting an entirely different objection as a reason for holding the court to be in error.[8]

Defendant's objection is really an indirect attack upon the information. His

4. See State v. Null, 355 Mo. 1034, 199 S.W. 2d 639, 642; State v. Gannaway, Mo., 313 S.W.2d 653.

5. 42 C.J.S. Indictments and Informations § 155, p. 1085; State v. Strickler, Mo. App., 224 S.W.2d 133; State v. Long, 341 Mo. 766, 108 S.W.2d 388; State v. Wilson, Mo., 286 S.W.2d 756; State v. Whalen, 234 Mo. 539, 137 S.W. 881.

6. State v. Hartman, 364 Mo. 1109, 273 S.W.2d 198.

7. State v. Eaves, 362 Mo. 670, 243 S.W. 2d 129; State v. Lindner, Mo., 282 S.W. 2d 547.

8. State v. Click, Mo., 57 S.W.2d 1077; State v. Vanarsdall, Mo., 273 S.W. 733; State v. McGuire, 327 Mo. 1176, 39 S.W. 2d 523; State v. Strait, Mo., 279 S.W. 109; State v. Smith, Mo., 261 S.W.2d 50.

*only* cited authority on this point, Anderson v. Kraft, Mo.App., 129 S.W.2d 85, 90, holds that reasonable rules of the Public Service Commission have the force and effect of statutes and must "be pleaded in such a manner *as to apprise the opposite party of the basis of the charge* which is being made against him, * * *". (Our emphasis.)

All that is necessary in an information is that it state the essential facts which allegedly constitute the offense so the defendant will be informed with reasonable certainty whereof he is charged, so that the admissibility of evidence can be determined, and so that, when the case is done, it will bar another prosecution for the same offense.[9] One of the tests of the sufficiency of the facts stated is whether or not, if taken as true, they disclose the defendant to have committed the offense.[10] In this case the defendant was informed that he had driven a motor vehicle as a licensed motor carrier upon the highway at a speed of more than 50 miles per hour, contrary to Rule 44 of the Public Service Commission. It told him what acts he was charged with doing and what rule he had violated. This we think is sufficient.[11]

A further assignment is that the information was fatally defective because it did not affirmatively allege that a certified copy of Rule 44 had been filed in the office of the Secretary of State as required by Section 536.020 (appellant's only cited authority on this point), which provides that each state agency shall file in the office of the Secretary of State a copy of each rule adopted, and such rule shall become effective ten days thereafter unless a later date is required.

If the information can be said to contain the barest essentials, the courts are not indulgent of an attack first made after verdict.[12] The law is also that informations are construed more liberally and with less regard to technicality in misdemeanors than in felonies.[13]

We think what we have said heretofore in reference to the information is applicable to appellant's contention here. He was informed of the acts he was charged with having done, and the information stated that such acts were in violation of Rule 44. The crime was the acts which were a violation of the rule. The charge that the rule was violated necessarily presupposed the existence and applicability of the rule. The various steps and procedures whereby such rule was adopted and became in force were extrinsic to the ultimate fact, matters of evidence not to be pleaded in an information.[14]

Under the command of the statute, it was the duty of the commission to file its rules. In the absence of anything to the contrary, it should be assumed that this was done.[15] And under Section 545.030(15), no indict-

9. Supreme Court Rule 24.01, 42 V.A.M.S.; 42 C.J.S. Indictments and Informations § 130, p. 1022; State v. McCloud, Mo. App., 313 S.W.2d 177, 181; State v. Stringer, 357 Mo. 978, 211 S.W.2d 925; State v. Crawford, Mo., 251 S.W.2d 76; State v. Reynolds, Mo.App., 274 S.W.2d 514; refer to note 12.

10. State v. Little, Mo.App., 287 S.W. 809.

11. City of Plattsburg v. Smarr, Mo.App., 216 S.W. 538; City of Cape Girardeau v. Bennett, Mo.App., 27 S.W.2d 447; see 42 C.J.S. Indictments and Informations §§ 137 and 138, p. 1033.

12. Supreme Court Rule 25.06; Tucker v. Kaiser, Mo., 176 S.W.2d 622; State v. Rizor, 353 Mo. 368, 182 S.W.2d 525; State v. Biven, Mo., 151 S.W.2d 1114, 1118.

13. State v. Jump, 176 Mo.App. 294, 162 S.W. 633; State v. Short, Mo.App., 228 S.W.2d 15.

14. 42 C.J.S. Indictments and Informations §§ 114 and 115, pp. 995 and 996; City of East Prairie v. Greer, Mo.App., 186 S.W. 952; State v. Becker, 248 Mo. 555, 154 S.W. 769; State v. Short, Mo.App., 228 S.W.2d 15, 18; State v. Stringer, 357 Mo. 978, 211 S.W.2d 925; Brown v. United States, 8 Cir., 143 F. 60.

15. State v. Krout, Mo., 282 S.W.2d 529; State v. Pogue, Mo.App., 282 S.W.2d 582.

ment or information shall be deemed invalid for want of any averment not necessary to be proved.

The question which occupies the most attention of the parties is that which concerns use of radar evidence.

A radar device was installed in an automobile which was parked beside Highway 66 at a point about 11 miles west of Rolla. The radar was operated by Trooper Findley, who had attended a short school of instruction in radar operation. Trooper Killgore parked his patrol car a quarter- to a half-mile up the road. Both cars were equipped with radio-telephone. Defendant drove his loaded auto transport through the radar beam, and Trooper Findley read the dial of the radar speedmeter at 65 miles per hour. He called Trooper Killgore, who made the arrest.

Trooper Killgore testified that he observed the approaching transport and it was his belief the defendant was exceeding 50 miles per hour. He further testified that after the arrest defendant admitted he had been traveling at 65 miles per hour. Hence the question here is one of admissibility of evidence and not submissibility of the case. Concerning such admissibility defendant contends (1) the Missouri courts do not recognize radar as a scientific means for detecting speed, (2) there was no evidence the troopers were qualified to use it, (3) there was no proof that the radar speedmeter was properly tested or (4) that it was properly functioning, also (5) that the testimony of the officers in reference to a test of the device was hearsay.

(1) *Is radar, as a device for detecting speed, a scientific principle so soundly established as to be accepted by the courts?* We think so. The state established by eminently qualified expert testimony that the principle of *RA*dio *D*etection *A*nd *R*anging is the use of exact laws of science and nature in the measurement of distance and speed. This is supported by the evidence in a great many cases and by the declaration of numerous authorities.[16] We think it is now time for the courts, which must of necessity maintain a conservative attitude, to recognize by judicial knowledge what those learned in electronics confirm, what the man in the street accepts, and what thousands of present and former members of our armed services have helped to demonstrate—that a radar speedmeter is a device which, within a reasonable engineering tolerance, and when properly functioning and properly operated, accurately measures speed in terms of miles per hour.[17]

16. A—State v. Dantonio, 1955, 18 N.J. 570, 115 A.2d 35, 49 A.L.R.2d 460; A—People v. Magri, 1958, 3 N.Y.2d 562, 170 N.Y.S.2d 335, 147 N.E.2d 728; A—United State v. Dreos, 1957, D.C.Md., 156 F. Supp. 200; A—People v. Sachs, 1955, 1 Misc.2d 148, 147 N.Y.S.2d 801; A—City of East Cleveland v. Ferell, Ohio App.1957, 145 N.E.2d 134; A—People on Inf. of Laibowitz v. Katz, 1954, 205 Misc. 522, 129 N.Y.S.2d 8; A—People on Complaint of Igoe v. Nasella, City Mag.Court, 1956, 3 Misc.2d 418, 155 N.Y.S.2d 463; A—see People v. Duskin, 1958, 11 Misc.2d 945, 174 N.Y.S.2d 527; A—State v. Moffitt, 9 Terry, Del., 210, 100 A.2d 778; Hardaway v. State, Tenn. 1957, 302 S.W.2d 351; Dietze v. State, 1956, 162 Neb. 80, 75 N.W.2d 95; People v. Sarver, 205 Misc. 523, 129 N.Y.S. 2d 9; Peterson v. State, 1957, 163 Neb. 669, 80 N.W.2d 688(4); see State v. Ryan, 1956, 48 Wash.2d 304, 293 P.2d 399; People v. Beamer, 130 Cal.App.2d Supp. 874, 279 P.2d 205; see Royals v. Commonwealth, 198 Va. 883, 96 S.E.2d 816; 49 A.L.R.2d 469, annotation; 33 N.C.L.Rev. 343–355 (1955); 23 Tenn.L. Rev. 784 (1955). We also find reference to other articles as follows: 40 Va.L. Rev. 809 (1955), 38 Marq.L.Rev. 129 (1954); 28 Tul.L.Rev. 400 (1954); 39 Iowa L.Rev. 511 (1954); 30 Wash.L.Rev. 49 (1955).

See also "Arrest by Radar Speedmeters," Hough, Mo.L.Rev., April 1959 (not yet officially published).

Contra: People of City of Rochester v. Torpey, 1953, 204 Misc. 1023, 128 N.Y.S. 2d 864; People of City of Buffalo v. Beck, 1954, 205 Misc. 757, 130 N.Y.S. 2d 354; People v. Offermann, 204 Misc. 769, 125 N.Y.S.2d 179.

17. Refer to cases marked "A" in note 16.

We do not wish to go further into the application of these physical laws than is required to demonstrate why it is necessary to hedge our judicial acceptance of *the principle* with some restraint and conditions put upon *the use* of the device which translates the application of these laws into terms of speed. This court yields to no group in its collective ignorance of science in general, but, *if we understand* the subject, energy in the form of micro radio waves is sent, "beamed," out from the radio antenna. These waves, traveling at the speed of light and, so it is said, at a frequency of 2455 million per second, strike the moving target and rebound, "echo," to the set at a slightly changed frequency, where a portion of the returning wave crests combine with the outgoing crests and produce the phenomenon of "beats" similar to that used by players of musical instruments in tuning their instruments (such as the throbbing produced when two adjacent notes on the piano are struck simultaneously). In other words, "beats" occur in radio waves as in sound waves. The combination of the outgoing and returning waves produces a small electrical current which varies with the beat frequency, and this in turn is translated into terms of miles per hour upon a meter.[18] We attempt this uneducated generalization of the process, not because an understanding of the means is necessary to its acceptance—for whether the radar device is an instrument applying known laws of science, or whether it is a genie in a jug, emitting evil emanations, makes no difference; the important thing is that *it works*—but in order to demonstrate that, a radar device being an instru-

ment constructed by human hands, dealing with delicate measurements, and having a rather feminine need for primping, some regard must be had to proper maintenance and usage [19] and to engineering tolerance. The evidence given by the machine should not be accepted if the question involved falls within this tolerance. Professor Skitek, the expert in this case, puts the necessary engineering tolerance of the device used here at one mile per hour. Some cases have given indication that a tolerance of two or three miles per hour may be desirable.[20] But since the registered speed in this case was 65 miles per hour and the speed limit involved is 50 miles per hour we need not consider the subject of engineering tolerance in this case.

■ (2) *Were the troopers qualified to use the device?* It appears from the evidence that the device used by the Missouri Highway Patrol was a radar speedmeter model S–2A, manufactured by the Automatic Signal Division of Eastern Industries; that the intelligent *use* of this device does not require that the operator understand all of the intricate steps in its manufacture or its process of operation. Trooper Findley testified that he had attended a short school of instruction. The authorities on the subject indicate that a reasonably intelligent person can learn to operate such a device after an hour and a half's instruction.[21] One need not be qualified to manufacture a clock in order to wind, set, and read it.

■ (3) *Was the machine properly tested and functional at the time of the occurrence?* All the authorities seem to

18. If this explanation is not clear, we refer to the Doppler formula as explained by Dr. Kopper in 33 N.C.L.Rev. 347:

$$F_r - F_t = \frac{c + v}{c - v} F_t - F_t$$

$$= \frac{c + v}{c - v} F_t - \frac{c - v}{c - v} F_t$$

19. See the rules laid down for use in People v. Sachs, 1 Misc.2d 148, 147 N.Y.S. 2d 801, 809.

20. State v. Dantonio, 18 N.J. 570, 115 A.2d 35, 49 A.L.R.2d 460; People v. Sarver, 205 Misc. 523, 129 N.Y.S.2d 9; People on Complaint of Igoe v. Nasella, City Mag. Court, 3 Misc.2d 418, 155 N.Y.S.2d 463; Hardaway v. State, Tenn., 302 S.W. 2d 351.

21. 33 N.C.L.Rev. 353.

agree[22] that the character of the device is such that, to be acceptable as correctly indicating speed, it must be carefully tested and found to be correct at or near the time of its use in traffic regulation.

Tests were made in this instance as follows: Shortly before defendant's arrest, .and at the point where the arrest occurred, Trooper Findley set up and aimed his beam down the road. Trooper Killgore first drove his car through the zone at a speed registered on his speedometer as 50 miles per hour, then at 70 miles per hour. Trooper Findley observed the dial of the speedmeter in the radar car, and the dials of the car speedometer and the radar speedmeter corresponded. In addition, Trooper Findley also checked the machine by use of tuning forks, so calibrated to correspond with oscillations activating the radar meter registration of 50 miles per hour and 70 miles per hour.

(4) *Are tests made simply by run-through comparison of patrol car speedometer sufficient to establish accurracy of the radar speedmeter?* It would seem to us that the value of such tests would depend upon the accuracy of the measuring device against which it is checked. While it is common knowledge that an automobile speedometer reflects *approximate* speed, it is also common knowledge that there is considerable variance in the speedometers of different cars, depending upon a number of factors. We note that there is some dearth and discord in the decisions as to whether untested speedometer readings, standing alone, are acceptable as evidence of speed in a criminal case.[23] But, as remarked in People v. Sachs, 1 Misc.2d 148, 147 N.Y.S.2d 801, 809, we must have a point of faith somewhere. We note that in some cases the point of faith begins with a calibrated master speedometer against which the patrol cars are periodically checked.[24] There is no evidence in this case that the speedometer in the Killgore car was accurate or that it had ever been checked. If such a situation existed in a close case, where there was a slight difference between the allowed and actual speed, we might question the admissibility of such speedometer evidence; but here there was an excess of 15 miles per hour. In addition, there was the confirmation of the tuning fork test. These tests we think were sufficient to make the evidence of the radar speedmeter admissible.

This conclusion also disposes of the contention that there was no evidence that the device was properly functioning. Recognizing that the device might not be properly functioning upon occasions and under some circumstances (as, for instance, not being warmed up, variations in power in the battery, or disturbances in the electrical field such as might be made by a diathermy machine), and that it is the obligation of the proponent who uses it to establish *prima facie* that the machine was properly functioning, we think the dual tests made almost immediately before the occasion establish the fact. The proof of the pudding is in the eating.[25]

The last objection, that the testimony of the officers in regard to the tests

---

22. With the possible exception of State v. Ryan, 48 Wash.2d 304, 293 P.2d 399.

23. 21 A.L.R.2d 1200, annotation; Pro: Peterson v. State, 163 Neb. 669, 80 N.W. 2d 688(5); see Commonwealth v. Buxton, 205 Mass. 49, 91 N.E. 128; Con: See People v. Sarver, 205 Misc. 523, 129 N.Y.S.2d 9; People v. Heyser, 2 N.Y. 2d 390, 161 N.Y.S.2d 36, 141 N.E.2d 553, and cases cited; People v. Magri, 3 N.Y. 2d 562, 170 N.Y.S.2d 335, 147 N.E.2d 728; People v. Tanner, Co.Ct., 6 Misc. 2d 1007, 165 N.Y.S.2d 308; Com. v. Schweitzer, 42 Berks County Law Journal 169 (Pa.); see State v. Dantonio, 18 N.J. 570, 115 A.2d 35, 49 A.L.R.2d 460.

24. People v. Sachs, 1 Misc.2d 148, 147 N.Y.S.2d 801; see People v. Tyler, Sp. Sess., 109 N.Y.S.2d 756; see City of Spokane v. Knight, 96 Wash. 403, 165 P. 105.

25. Dietze v. State, 162 Neb. 80, 75 N.W.2d 95; Commonwealth v. Buxton, 205 Mass. 49, 91 N.E. 128.

was hearsay, is based upon an interpretation of the holding in People v. Offermann, 204 Misc. 769, 125 N.Y.S.2d 179, which we reject. In the case before us both officers testified as to what their respective meters showed during the run-through tests. The fact that they communicated these results to each other via radiophone does not lessen the fact that when each testified in respect to his individual meter readings he related what he saw, and not what the other told him.

It is our conclusion that the reliability of the radar device, at the time and on the occasion and in its then condition, was *prima facie* established and that the jury were entitled to receive and weigh such evidence along with all the rest.

Finding no error, we affirm the judgment of conviction.

STONE, P. J., and McDOWELL, J., concur.