STATE of Missouri,
Plaintiff-Respondent,

v.

Nita J. DAHLGREN,
Defendant-Appellant.

No. 62978.

Supreme Court of Missouri,
En Banc.

Jan. 12, 1982.

As Modified On Court's Own Motion On
Denial of Rehearing Feb. 9, 1982.

James M. Kelly, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Thomas G. Auffenberg, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SEILER, Judge.

Defendant was convicted of manslaughter by culpable negligence in operating an automobile and sentenced to three years imprisonment. Section 565.005, RSMo 1978; § 565.031, RSMo 1978. The charge grew out of an automobile collision occurring August 10, 1979, on Glenstone Avenue in Springfield, Missouri, between a 1977 Chevrolet Monte Carlo, operated by defendant, and a 1978 Ford Pinto. Following the collision the Pinto was engulfed by flames from burning gasoline and a passenger in the Pinto burned to death.

The case was transferred here on application of defendant after an opinion was handed down by the court of appeals, southern district, affirming the conviction. We ordered the transfer primarily to consider whether the taking and introduction into evidence of a blood sample from defendant was proper under the circumstances. Now that the case is here, however, we will not limit our opinion to the point just mentioned, but will consider it as though here on original appeal. In so doing, we acknowledge our indebtedness to the author of the opinion in the court of appeals, Judge James K. Prewitt, and adopt much of his opinion verbatim.

■ We initially consider defendant's first point. Following the collision defendant was taken to a hospital for treatment of injuries and three blood samples were taken there. Defendant signed a consent to the taking of the blood specimens, but she contends that this consent was not freely and knowingly given and that the trial court erred in overruling her motion to suppress and in admitting the results of the blood alcohol test in the trial.

Although no claim is made by defendant of failure by the state to make a submissible case, we must set forth the facts in some detail because of their bearing on the claimed errors. At about 12:24 a. m., August 10, 1979, Officer Niehouse of the Springfield Police Department was parked in his police vehicle on South Glenstone on the east side of the street. His attention was attracted by the "loud motor noise" made by defendant's Chevrolet Monte Carlo automobile approaching from the south some two to two and one-half blocks away. To the north a short distance, a man named C. S. Nold had brought his 1978 Ford Pinto automobile to a stop on Glenstone, headed north at the intersection with Grand Avenue waiting for the traffic signal for north and south bound traffic at that intersection to turn from red to green. Mary Lee Scheidt was a passenger in Nold's car.

Officer Niehouse aimed his radar speed gun as defendant approached him and obtained a reading of fifty-four miles per hour and a second reading of sixty-seven miles per hour after the car passed. The officer's estimate of defendant's speed, based on his own traffic experience, was sixty miles per hour. The speed limit was forty miles per hour. Officer Niehouse started pursuing defendant's vehicle and about that time he observed the collision between defendant's vehicle and the stopped Pinto at the intersection of Grand and Glenstone and the eruption of flames. The back end of the Pinto was smashed close to the rear seat. The interior was completely burned. The vehicle was located about 160 to 190 feet north of the intersection after the accident.

Defendant had gotten off work about 7:30 p. m. She testified she had part of one drink—scotch and soda—with a friend at a nearby bar, staying there about an hour. Then she and a companion went to a restaurant-bar, the Shady Inn, where they were joined by two or three others. There defendant had some more drinks—again scotch and soda—"possibly less than four" and "definitely" less than six. She and two others left the Shady Inn in defendant's automobile, defendant driving, about 11:30 p. m. or midnight, intending to go to a local drive-in for breakfast and coffee. Her tes-

timony was that she was not feeling any effects from alcohol when she left Shady Inn and was not intoxicated.

At the scene of the accident the investigating police officer, Niehouse, noticed there was blood running down defendant's face. He could smell intoxicants on her breath, could see her eyes were bloodshot and noticed that her speech was somewhat slurred. Defendant and the other people in her automobile were taken to a local hospital in an ambulance. Officer Niehouse went to the hospital about 1:45 or 2:00 a. m., obtained the doctor's permission to talk to the defendant, who was lying in bed in the emergency room, and asked her to sign a release for a blood sample. He said she had been in an accident, that he believed she was intoxicated and that if she were released from the hospital he intended to book her on a charge of driving while intoxicated. Defendant did not say anything.

Fifteen to twenty minutes later the officer returned to the emergency room, again told defendant she had been in an accident and that he thought she was intoxicated and again asked her to sign the release. She said she would sign. Niehouse had a hospital secretary type a consent form, which he read to defendant. He testified she was coherent and seemed to understand what she was signing. He placed the form in her hands and she signed. Niehouse was firm in his opinion that defendant was intoxicated, but not "extremely" so. The blood samples were taken by a medical technologist on the hospital staff, Cynthia Eggert at 2:40 a. m. Eggert told defendant she needed to draw a sample of blood. Defendant appeared drowsy and asked if she could wait awhile. Eggert said "they" wanted it done now and asked if defendant had signed the release form. Defendant answered yes, offered the witness her arm, and the blood (three samples) was then drawn. No one else was in the room at the time. Eggert did not form an opinion as to whether defendant was intoxicated, but said defendant did not "really do or say anything" that led the witness to believe she was intoxicated.

Dr. Elms, who practices in emergency medicine, saw defendant around 1:00 a. m. in the emergency room. He smelled alcohol on her breath and person, noticed slurred speech, somewhat uncoordinated movement and a seeming inability to give a history of what had happened to her. He expressed the opinion that there was a "level of intoxication present", but was not more specific. As to physical injuries he found only an abrasion and swelling of the forehead. There was no bone injury to the head or neck. Dr. Elms kept defendant under periodic observation in the emergency room until 5:00 or 5:30 a. m., during most of which time she was sleeping, and then released her. At that point, Dr. Elms said she was much more alert, was oriented as to time and place and her speech was not slurred.

It does not appear how defendant got from the hospital to the Springfield police station where she arrived around 6:00 to 6:30 a. m. There is no evidence that defendant was brought to the station by the police or in any form of custody. There Officer Niehouse informed her she was under arrest, read defendant the *Miranda* rights from a card, and at 10:00 a. m. read the rights to defendant the second time. Both times defendant told Niehouse she understood her rights. No questioning was done at 6:00 a. m., but on the 10:00 occasion she signed a waiver and then Officer Niehouse and Sgt. Worsham questioned her about the collision, reduced the questions and answers to writing and she signed the statement. In this statement she said that she had had five drinks from 7:00 p. m. until the accident. She was asked whether she had been drinking too much to be driving. Her answer was "ordinarily no, but I guess I was." When asked if she though she was intoxicated at the time of the accident, her response was, "I guess I was, I really don't remember." The statement was offered and received in evidence over objection after the court in a hearing outside the presence of the jury had deter-

mined that it was voluntary.[1] She did not testify as to the taking of the blood samples or her signing the blood consent form, other than to say she did not remember having any blood drawn or talking to the police officer at the hospital.

With this background we return to defendant's first point about error in admitting evidence of the alcohol content of the blood samples. The testimony of the police officer who tested one of the blood samples at the police laboratory was that it showed .23 percent ethyl alcohol by weight.

It is well known that people differ in their sensitivity to alcohol and certainly there is evidence in the record from which it can be said that the consent was voluntary. Defendant did not object. The officer read the form to her. She signed it. She offered her arm to the nurse. She makes no claim that the police officer or the hospital people pressured or coerced her. The officer told her he considered her intoxicated and intended to charge her with driving while intoxicated when she was released. We conclude, from the record presented, that any intoxication present did not render defendant unable to appreciate the nature and consequences of signing the consent to obtain the blood samples, *State v. Mahaney*, 625 S.W.2d 112, decided November 16, 1981, and that the trial court did not err in overruling the motion to suppress the consent and the results of the blood tests.

■ Point two contends that the trial court should not have admitted evidence of the miles per hour reading shown by a radar unit directed toward appellant's car because the radar device developed a malfunction sometime between July 10, 1979 and August 28, 1979. The parties entered into a stipulation regarding the device, to the effect that if called a qualified electronics technician would testify that the radar unit was tested and found in proper working order on July 10, 1979; that on August 28, 1979, the same unit was repaired for a

malfunction which showed a constant reading of '00', and, after the repairs, was tested and found in proper working order on that date; that no other tests or repairs were made on the unit between July 10, 1979 and August 28, 1979.

The policeman operating the unit, Officer Niehouse, stated that approximately an hour and a half before he saw defendant's car he had checked the unit with two tuning forks, one of which was set to show a forty miles per hour reading and one to show a seventy miles per hour reading. When tested the unit showed the expected reading. The officer remained parked in a police vehicle in the same location during that time. What followed was the approach of defendant's vehicle and the use of the radar gun as described earlier herein.

Defendant contends that the malfunction could have affected the readings obtained on defendant's vehicle, as there was no showing by the state when the radar unit ceased to be functional. Defendant relies on *State v. Deimeke*, 500 S.W.2d 257 (Mo. App.1973) in contending that the malfunction prevented the radar device from being sufficiently reliable and competent as to justify the admission of the results shown on it. We do not think that *Deimeke* is controlling here. In *Deimeke* a breathalyzer machine was shown to have malfunctioned between December 1, 1970 and January 2, 1971. The test on the defendant was conducted on December 13, 1970. In the present case the radar unit was checked and found to be accurate shortly before the readings in evidence. The tuning forks used were found to be accurate both before and after they were used to test the unit. The malfunction which was repaired on August 28, 1979 was apparent to an operator, as it gave a reading of "00 all of the time". The unit was not doing this at the times it purported to show the speed of defendant's vehicle, and it would thus appear that the malfunction did not occur until thereafter. There is no contention before us that the

---

1. There is much evidence to support the court's finding of voluntariness and defendant does not contend otherwise on appeal.

unit was inadequately tested [See *Kansas City v. Hill*, 442 S.W.2d 89 (Mo.App.1969); *City of St. Louis v. Boecker*, 370 S.W.2d 731 (Mo.App.1963), and *State v. Graham*, 322 S.W.2d 188 (Mo.App.1959)], or, except for the malfunction, that a prima facie showing was not made that it was functioning properly at the time of the readings. Point two is denied.

■ We now consider point three. Ms. Eggert, the medical technologist earlier mentioned, testified that her test showed that the alcohol content of defendant's blood was "210 milligrams per deciliter". This test result was not translated by her into a percentage by weight of alcohol in the blood as specified in § 577.030, RSMo 1978 or MAI–CR2d 3.40. Because of this, defendant offered a withdrawal instruction as to her testimony concerning alcoholic content, which the court refused, erroneously, says defendant.

We do not read § 577.030 or MAI–CR2d 3.40 as prohibiting the introduction of blood alcohol evidence in the terms used. Ms. Eggert's test result, 210 milligrams of alcohol per deciliter of blood, is easily converted to grams of alcohol per one hundred milliliters of blood, which is the base prescribed by § 577.030.2. A milligram is $\frac{1}{1000}$ gram and a deciliter is one hundred milliliters. Thus, her test result expressed in the terms of the statute would be .21 grams of alcohol per one hundred milliliters of blood. The statute defines "percent" as being weight of alcohol in the blood based upon grams of alcohol (here .21 grams) per one hundred milliliters of blood. Section 577.030.2. In the example before us, the percent of blood alcohol, therefore, is .21%.

Further, another expert witness, Donald E. Smith, director of the Springfield police laboratory, testified to the alcohol content of defendant's blood by percentage of weight, placing it at .23%. Ms. Eggert's testimony in any event corroborated that there was alcohol in defendant's blood. We thus think that the requested instruction was not appropriate, as her testimony was relevant to the issues before the jury. Point three is denied.

■ Point four contends that an instruction given following MAI–CR2d 3.40 instructing the jury in terms of percentage by weight of alcohol in the blood was erroneous because it failed to say that more than one specimen of blood was taken from defendant and that, together with the medical technologist's testimony of "210 milligrams per deciliter", made said instruction improper and not in conformance with the evidence and confusing to the jury.

Note 4 of the Notes on Use under this instruction states that if more than one specimen is taken then "plurals must be used in the opening paragraph in referring to them." However, we do not see how the failure to do this misled the jury or was prejudicial to defendant. The blood was all taken at one time but put in three different tubes, one of which was tested at the hospital by Eggert and one of which was given to a police officer and later tested at the crime laboratory located at the Springfield Police Department. As said, Smith, the laboratory director, testified that the blood sample showed ".23 percent ethyl alcohol by weight", which was in accord with the type of measurement used in the instruction. We do not see how the Eggert testimony made the instruction confusing to the jury or prejudicial to defendant. Her testimony as to alcohol content was in terms of milligrams per deciliter without being expressed in terms of percent by weight. Had it been converted to percent by weight, it would have been approximately the same, in fact, slightly less, than the percent testified to by Smith. Under these circumstances, we do not believe her testimony as to blood alcohol content confused the jury or prejudiced defendant. Point four is denied.

The judgment is affirmed.

All concur.