

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | **WD77182** |
| **v.** | ) | |
| | ) | **OPINION FILED:** |
| | ) | **March 3, 2015** |
| **ROGER LEE PARSHALL,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Holt County, Missouri
The Honorable William S. Richards, Judge**

**Before Division I:** Cynthia L. Martin, Presiding Judge, and
Thomas H. Newton and Mark D. Pfeiffer, Judges

Roger Lee Parshall ("Parshall") appeals the judgment of the Circuit Court of Holt County, Missouri ("trial court"), finding him guilty, after a jury trial, of misdemeanor speeding under section 304.010. On appeal, Parshall claims that the trial court abused its discretion in admitting radar testimony and that his conviction is not supported by substantial evidence. We affirm.

## Factual and Procedural Background

On July 17, 2013, Trooper Joshua Zach ("Trooper Zach") of the Missouri State Highway Patrol was conducting construction zone speed limit enforcement on I-29 in Holt County.

Trooper Zach had been a trooper for over nine years. Trooper Zach utilizes a Stalker DSR 2X radar gun unit, which he has been trained to operate, and he possesses a certification establishing his expertise in the use and proper function of the radar unit. Pursuant to his training, at the beginning and end of each of his shifts, Trooper Zach performs tests to ensure the proper functioning of the radar unit; additionally, as soon as practicable after each radar enforcement use of the Stalker DSR 2X, he performs an interim test to again ensure that the radar unit is functioning properly at the site and time of each radar enforcement stop. The beginning-and-end-of-shift testing process involves both an "internal test" and a "tuning fork test." The in-shift interim testing after each enforcement use of the radar unit utilizes the "internal test" only.

The "internal test" consists of data retrieval that is programmed by the manufacturer into the Stalker DSR 2X and is conducted by pressing a button on the radar unit that then internally identifies a machine search of the proper functioning of the separate radar components of the radar unit and issues a reading that must show "pass" in both of two separate screens on the radar unit. The "tuning fork test," as described by Trooper Zach, is "just basically two metallic-like forks that when you strike them against something and hold them in front of a radar antenna the frequency that's given off these forks will present a certain number on the radar. So we go through that on each antenna [rear and front]." Thus, of the two tests, the "internal test" is less subjective or dependent upon human interaction than the "tuning fork test."

At the beginning (morning) and the end of his shift (later that day) on July 17, 2013, Trooper Zach conducted both an internal test and a tuning fork test[1] on his Stalker DSR 2X radar

---

[1] The tuning forks that Trooper Zach used to test his radar unit were also current on their own calibration testing. Thus, the tuning forks themselves were tested for accuracy, and the tuning forks served as a test of the accuracy of the internal calibration equipment of the radar unit. Consequently, unlike *City of Ballwin v. Collins*, 534 S.W.2d 280 (Mo. App. 1976), there was evidence that the measuring devices used to test the radar unit at relevant

unit; these tests indicated that his radar unit was functioning properly. Trooper Zach then drove to the enforcement area, made sure the construction zone speed limit signs were posted and visible, set up on the shoulder, and began observing traffic.

At approximately 8:55 a.m., Trooper Zach observed a pickup truck that was, based upon Trooper Zach's experience and estimation, traveling at around seventy-five miles per hour, well in excess of the posted fifty-five miles per hour speed limit for the construction zone. Trooper Zach checked the pickup's speed with his radar unit, which indicated that the truck was traveling at a speed of seventy-six miles per hour. As the pickup passed the patrol car, its brake lights were activated. Trooper Zach stopped the pickup and wrote Parshall, the driver, a speeding ticket. Immediately thereafter, Trooper Zach—as he had been trained to do—performed a separate internal test to ensure that the radar unit was then and there still functioning properly; the internal test verified the proper functioning of the radar unit.

At Parshall's trial, Trooper Zach testified to the above facts. After Trooper Zach testified, the jury saw the footage from Trooper Zach's patrol car's dashboard camera. The video showed Parshall's pickup truck passing the patrol car traveling noticeably faster than the rest of the traffic and braking after it passes Trooper Zach's patrol car. After the pickup was stopped, the audio captures several statements by Parshall, including:

- "Oh crap."

- "I've got one bad habit."

- "I've got concrete going."

times on July 17, 2013, were themselves tested for accuracy. Though Parshall attempted to interject the "testing of the measuring devices" foundation argument for the first time at oral argument of this appeal, the record refutes this belated argument; additionally, this court does not consider arguments made for the first time "in argument" on appeal. *See Burg v. Dampier*, 346 S.W.3d 343, 354 (Mo. App. W.D. 2011). Instead, "[w]here the objection [at trial] is that an inadequate foundation has been laid it is 'particularly important' that the objection made be specific because foundation deficiencies can frequently be remedied." *State v. Brown*, 949 S.W.2d 639, 642 (Mo. App. E.D. 1997).

- "You don't know how bad it is. This will probably be my license."

- "I'm a good guy, I just drive too fast."

Parshall did not testify or present any evidence. The jury found Parshall guilty, and he appeals.

## Standard of Review

"Where a criminal defendant challenges the sufficiency of the evidence to support [his] conviction, this Court's review is limited to determining whether sufficient evidence was admitted at trial from which a reasonable trier of fact could have found each element of the offense to have been established beyond a reasonable doubt." *State v. Burrell*, 160 S.W.3d 798, 801 (Mo. banc 2005) (citing *State v. Clay*, 975 S.W.2d 121, 139 (Mo. banc 1998)). "This Court accepts as true all evidence favorable to the verdict and disregards all evidence and inferences to the contrary." *Id.* (citing *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993)). We review evidentiary rulings for an abuse of discretion. *State v. Davis*, 318 S.W.3d 618, 630 (Mo. banc 2010).

## Analysis

Parshall's first point on appeal is that the trial court erred in admitting Trooper Zach's testimony that his radar unit reported Parshall's vehicle's speed at seventy-six miles per hour because there was insufficient foundation for the testimony. Specifically, Parshall claims because Trooper Zach did not conduct "a tuning fork test" at the site of and reasonably close to the time of the alleged Parshall speeding violation, there is not sufficient foundation for Trooper Zach's testimony as to the results of his radar unit.

4

Parshall primarily relies upon *City of St. Louis v. Boecker*, 370 S.W.2d 731 (Mo. App. 1963), and subsequent cases that cite to *Boecker*. This court has previously summarized the holding of the identical cases Parshall now relies upon:

> [Appellant] argues that her conviction should be reversed because this case is controlled by *City of St. Louis v. Boecker*, 370 S.W.2d 731, 737 (Mo. App. 1963); *State v. Weatherwax*, 635 S.W.2d 34, 35 (Mo. App. 1982), and *City of Jackson v. Langford*, 648 S.W.2d 927, 929 (Mo. App. 1983), which hold that a speeding conviction cannot be based upon a radar device reading without proof that *the device was tested and found to be functioning properly at the site of the alleged violation and reasonably close to the time it occurred*.
>
> In *Boecker*, the officer tested the radar device with a tuning fork before he left the police station to go on duty. 370 S.W.2d at 734. In *Weatherwax*, the officer tested the radar device with tuning forks while parked in the driveway of his home prior to going on duty. 635 S.W.2d at 34-35. In *Langford*, there was no evidence of the time and place of testing. 648 S.W.2d at 929. In these cases, the courts held the evidence to be insufficient to support a conviction.

*State v. Rawlins*, 932 S.W.2d 449, 451 (Mo. App. W.D. 1996) (emphasis added).[2]

As was identified in *Rawlins*, the key focus of *Boecker*, *Langford*, and *Weatherwax* was not on *what* testing was performed to ensure that the stationary radar unit was functioning properly; rather, each of the cases cited focused on *when* and *where* the testing was performed. For example, the court in *Boecker* questioned whether testing with a tuning fork is sufficient to establish the accuracy of the stationary radar device, noting that the leading expert in 1963 (a Dr. Kopper) does not mention tuning fork tests in his liturgy on reliability testing of stationary radar devices. *Boecker*, 370 S.W.2d at 736. In fact, the *Boecker* court goes on to comment that the

---

[2] In *Rawlins*, we noted that this precedent is only relevant to cases "involv[ing] a stationary radar device, not moving radar." *State v. Rawlins*, 932 S.W.2d 449, 451 (Mo. App. W.D. 1996). We cited to the Missouri Supreme Court's analysis in *State v. Calvert*, 682 S.W.2d 474, 478 (Mo. banc 1984), and noted that "a site test is of questionable utility in the case of a moving radar device" and proceeded to apply the test for reliability of evidence relating to a moving radar device. *Rawlins*, 932 S.W.2d at 451-52. Given the focus on "device," we question if our Supreme Court would apply a similar evidentiary admission standard to radar devices that are hybrid—in other words, a radar device that is capable of both moving and stationary radar detection use. Frankly, the radar device used in this case—the Stalker DSR 2X—is just such a device. We anticipate that most, if not all, radar devices used by law enforcement today have advanced far beyond the 1963 version referenced in *City of St. Louis v. Boecker*, 370 S.W.2d 731 (Mo. App. 1963). Irrespective, given the factual posture of the present case, we need not and do not substantively discuss that issue in our ruling today.

5

city's expert witness at trial, while testifying as to the science of radar device circuitry, never once testified about the reliability or accuracy of a tuning fork test. *Id.* Instead, the *Boecker* court noted that even if the police officer had performed any form of testing on the stationary radar device in question, the problem was that there was no testimony that any such testing—whatever it may have been—was performed "at the site of and reasonably close to the time of an arrest" for speeding. *Id.* at 737.

The same is true of the precedential import of *Weatherwax* and *Langford*. There is no declaration in any of these cases concluding that, specifically, a tuning fork test (to the exclusion of any other testing) must be used at the site of and reasonably close to the time of an arrest for speeding; rather, the only requirement is that testing sufficient to establish reliability[3] of the stationary radar device be performed at the site of and reasonably close to the time of an arrest for speeding.

Here, the stationary radar device in question "was tested [by Trooper Zach] and found to be functioning properly at the site of the alleged violation and reasonably close to the time it occurred." *Rawlins*, 932 S.W.2d at 451. Trooper Zach had been trained to check for the proper functioning of the Stalker DSR 2X by performing an internal test and a tuning fork test at the beginning and end of each shift, and he was further trained to perform an internal test as soon as practicable after each radar enforcement use of the Stalker DSR 2X radar device. This training and Trooper Zach's certification for use of the Stalker DSR 2X radar device were designed to ensure that the radar device was functioning properly at the beginning of his shift, at the end of his shift, and at all times in between when the radar device was actually used as a law enforcement tool for speed enforcement. Trooper Zach testified that on July 17, 2013, he

---

[3] At trial, Parshall never specifically objected to the "internal test" as a valid or scientifically accepted radar device accuracy performance test and, likewise, did not request a *Frye* hearing on the topic. *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

6

performed all of these performance tests, specifically including testing of the Stalker DSR 2X radar device immediately after his speed enforcement stop of Parshall, which, viewing the evidence favorably to the verdict, was at the site of the speeding enforcement use of radar device related to the Parshall stop. The trial court accepted this testimony as evidence of reliability—that the radar device in question "was tested and found to be functioning properly at the site of the alleged violation and reasonably close to the time it occurred."

We find no abuse of discretion in the trial court's ruling admitting the radar device results evidencing Parshall's speeding.

Point I is denied.

Parshall's second point on appeal is that the trial court erred in entering judgment against him in that there was not sufficient evidence to support his conviction. Given our ruling on Point I, the evidence of the results of Trooper Zach's radar device certainly constituted substantial evidence supporting Parshall's conviction. In addition, Trooper Zach testified that, based upon his over nine years of experience with the highway patrol enforcing speed limits, he observed Parshall traveling at a speed that he estimated to be about seventy-five miles per hour. Further, the jury saw Trooper Zach's patrol car's dashcam video showing Parshall's vehicle traveling at a rate of speed that appears noticeably faster than the rest of the traffic, and the vehicle is seen braking as soon as it passes the patrol car. Finally, the audio from the dashcam reveals Parshall making several incriminating statements. While Parshall argues that his remarks on the audio do not amount to a confession, and we agree, they are still incriminating statements evidencing consciousness of his guilt. *See State v. Gilmore*, 22 S.W.3d 712, 718 (Mo. App. W.D. 1999) ("The defendant need not expressly acknowledge his or her guilt for the statement to

7

qualify as an admission."). In this case, Parshall can be heard making what sounds like the following statements:

- "Oh, crap."

- "I've got one bad habit."

- "I've got concrete going."

- "You don't know how bad it is. This will probably be my license."

- "I'm a good guy, I just drive too fast."

These statements, accompanied by the video, Trooper Zach's testimony that he observed Parshall to be driving in what he estimated to be twenty miles per hour in excess of the posted speed in a construction zone, and Trooper Zach's testimony regarding the radar device reading, collectively constitute substantial evidence sufficient to support Parshall's conviction.

Point II is denied.

### Conclusion

Finding no error, we affirm the judgment of the trial court.

_____
Mark D. Pfeiffer, Judge

Cynthia L. Martin, Presiding Judge, and
Thomas H. Newton, Judge, concur.

8